UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



TIARRA FAIN,

    Plaintiff,

v.                                           Case No.: 3:12CV293

RAPPAHANNOCK REGIONAL JAIL
SUPERINTENDENT JOSEPH HIGGS,
CORRECTIONAL OFFICER STONE,
CORRECTIONAL OFFICER SCHOOLFIELD,
CORRECTIONAL OFFICER REED,
JOHN DOE 1,
JOHN DOE 2,
JANE DOE 1,
JANE DOE 2,
JOHN DOE 3-5,
And
JANE DOE 3-5.

    Defendants.

## COMPLAINT

### STATEMENT OF JURISDICTION

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §451, 1331, 1337, 1343 and 1345. This case arises out of the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983. Venue is proper, as the primary events in question occurred in Fredericksburg, Virginia, in the Richmond Division of the United States Court, Eastern District of Virginia. The Court has supplemental jurisdiction over Plaintiff's state law claims by virtue of 28 U.S.C. §1367.

## **PARTIES**

1. Plaintiff, Tiarra Fain, is a resident of the Commonwealth of Virginia and citizen of the United States of America. At all relevant times she was an inmate at the Rappahannock Regional Jail (RRJ) in Stafford County, Commonwealth of Virginia.

2. Defendant, Joseph Higgs, is a resident of the Commonwealth of Virginia. At all relevant times he was employed as the Superintendent at RRJ, having primary supervisory responsibility over the facility, its employees and inmates.

3. In his supervisory capacity, Defendant Higgs was responsible for establishing the policies of RRJ, and for training and supervising Defendants and the other jail employees. He further had the sole discretion to dictate the manner in which Defendants and all other guards would implement the customs and practices of RRJ concerning the care and treatment of pregnant inmates, including Plaintiff.

4. Plaintiff is suing Defendant Higgs is sued in both his official and individual capacities.

5. Defendant, __ Stone, is a resident of the Commonwealth of Virginia and at all times relevant herein was employed as a corrections officer at RRJ, and entrusted with the care and custody of Plaintiff. Defendant Stone is sued in her individual capacity.

6. Defendant, __Schoolfield, is a resident of the Commonwealth of Virginia and at all times relevant herein was employed as a corrections officer at RRJ, and entrusted with the care and custody of Plaintiff. Defendant Schoolfield is sued in her individual capacity.

7. Defendant, __Reed is a resident of the Commonwealth of Virginia and at all times relevant herein was employed as a corrections officer at RRJ, and entrusted with the care and custody of Plaintiff. She is sued in her individual capacity.

8. Defendants, John Does 1-5 and Jane Does 1-5, to be identified in the course of discovery, are residents of the Commonwealth of Virginia and at all times relevant herein were employed as corrections officers at RRJ, and entrusted with the care and custody of Plaintiff. They are sued in their individual capacity. These persons are also referred to herein as guards.

10. Defendants Stone, Schoolfield, John Doe 1, John Doe 2, and Reed brought Plaintiff to Mary Washington Hospital from RRJ, and worked in shifts throughout Plaintiff's labor, delivery, and discharge.

11. At all times relevant, Plaintiff was under the supervision of at least 1 (one) of the Defendant guards.

## STATEMENT OF FACTS

12 Plaintiff incorporates paragraphs 1 through 11 by reference herein.

13. On or about February 25, 2010, Plaintiff was convicted, in the Circuit Court of Stafford County, Virginia, of the non-violent offenses of forgery and providing false information to a police officer.

14. Plaintiff was transferred directly to RRJ. At the time, she was seven (7) months pregnant.

15. Plaintiff's medical records indicated that hers was a high-risk pregnancy, due a history of macrosomia, decreased fetal movement, high blood pressure, rapid weight loss, and other medical issues.

16.     Throughout her incarceration at RRJ, Plaintiff was a model inmate, and had never been assessed as violent or combative. Indeed, Plaintiff could not reasonably be a security risk, as she was incarcerated for crimes that involved no violence, and was in an advanced stage of pregnancy.

17.     On or about April 18, 2010, Plaintiff began to have labor contractions, and was transferred by ambulance to Mary Washington Hospital ("MWH") in the City of Fredericksburg, Virginia.

18.     Defendant Stone accompanied Plaintiff to MWH, during which trip Plaintiff was handcuffed and shackled at the legs.

19.     Upon her arrival at MWH, Defendant Stone publicly escorted Plaintiff, still shackled, through the hospital to her room.

20.     In her hospital room, Defendant Stone tied leather straps attached to the handcuffs onto the left side of the bed, so that her right arm was stretched across her chest. She was also strapped by her left leg to the bed.

21.     So shackled, Plaintiff went into labor on or about 9:03 a.m. Plaintiff was kept shackled in this manner throughout almost (11) hours of labor and delivery. At all times during her labor, an armed guard remained in the hospital room.

22.     At some point during Plaintiff's period of labor, Defendant Schoolfield was on guard. A nurse on duty instructed Defendant Schoolfield to remove the shackles, as it was against hospital policy. Saying that it was jail policy, Ms. Schoolfield refused.

23.     The nurse insisted, and Defendant Schoolfield removed Plaintiff's handcuffs. Once the nurse left Plaintiff's room, Defendant Schoolfield re-cuffed Plaintiff and hid the restraints with a blanket.

24. During the delivery process, and over her physician's objection, Plaintiff was kept shackled by her left arm and left leg by harsh restraints to a hospital bed. Plaintiff was unable to walk as a normal person would do to get the contractions going, which caused Plaintiff additional pain and discomfort. Plaintiff was unable to reposition herself for comfort or in such a way necessary to successfully engage in the delivery. The shackling was particularly dangerous, as Plaintiff's umbilical cord was wrapped around the baby's neck, which almost necessitated an emergency cesarean section. To complicate matters, Plaintiff also experienced several asthma attacks. At all times, an armed guard was present.

25. At approximately 7:50 p.m., Plaintiff gave birth to a healthy baby boy.

26. Plaintiff's physician ordered that she be permitted to stand up and walk around. One or more of the Defendant guards declined the physician's order on the basis of jail policy. Plaintiff remained shackled by her left arm and left leg, causing her excruciating pain.

27. The Defendant guard(s) refused to remove the restraints to allow Plaintiff to properly breastfeed with two (2) hands. The wrist shackles kept hitting the baby's head. Plaintiff was further denied privacy. At one point, a Caucasian male guard (John Doe 5), whose identity will be determined in the course of discovery, was alone with Plaintiff in her room. To Plaintiff's extreme humiliation, he watched Plaintiff breastfeed. Without medical authorization to do so, the same guard attempted to remove the baby from Plaintiff's arms several times.

28. Throughout her hospital stay, Plaintiff was denied the use of the telephone, the call bell, or any other way to communicate with the nursing staff or her family. The

5

child's father, who was voluntarily given custody of Plaintiff's baby, came on his own without having been notified.

29. Each time Plaintiff needed to use the restroom, one of the defendant guards would remove her arm shackles, and secure them to her ankles, thereby causing severe discomfort and embarrassment, and a risk of falling.

30. Throughout the next two (2) days of her hospital stay, per the Defendant guards' insistence, Plaintiff was kept shackled, by two (2) or three (3) limbs. Plaintiff was handcuffed by both arms with one leg cuffed. When Plaintiff had to go to the bathroom located inside of the hospital room, cuffs were placed on both ankles.

31. Plaintiff was never combative, and did not exhibit behavior consistent with being either a flight risk or dangerous, and yet none of the Defendant guards ever replaced the leather straps and handcuffs with softer, more flexible restraints.

32. On April 19, 2010, Plaintiff was returned, still shackled, to the custody of the RRJ.

33. Upon her discharge, Plaintiff was ordered a breast-pump to safely and hygienically remove the breast milk she produced while she was separated from her infant son. The breast pump was confiscated by one of the Defendant-guards (whose identity will be determined in discovery), and not returned to her. Plaintiff suffered breast pain as a result.

34. Also upon her discharge, Plaintiff was prescribed pain medication, which was never provided to plaintiff after she returned to RRJ; as a result, she was forced to endure pain.

35. The American College of Obstetricians and Gynecologists opposes the shackling of female prisoners during and immediately after labor.

36. The American Medical Association opposes the shackling of women in labor or recuperating from delivery:

> unless there are compelling grounds to believe that the inmate presents:
> An immediate and serious threat of harm to herself, staff or others; or
> a substantial flight risk and cannot be reasonably contained by other
> means. If an inmate who is in labor or who is delivering her baby is
> restrained, only the least restrictive restraints necessary to ensure
> safety and security shall be used.

See American Medical Association Resolution 203, Adopted 2010.

37. On June 8, 2010, Plaintiff filed an Inmate Request Form "the Form" attached as Exhibit "A" hereto, for the purpose of making an administrative complaint against the jail. This was her right as an inmate. On this form, which was redacted, presumably by RRJ officials, Plaintiff wrote the following, in part:

> Is it 'jail procedure' to restrain pregnant women to the bed
> during labor and delivery? I ask because it seems a little
> unethical and it was done to me during my childbirth ..
> (redacted) I am not violent, and have never given officers
> any reason to feel like I was dangerous. I'm very respectful.

A Corporal, whose name has been redacted, and will be identified in discovery, wrote the following response:

> Even though you are pregnant you are still considered an
> inmate and we have to take precautions.

38. The Inmate Request Form was neither forwarded to Plaintiff's case manager, nor was it returned to Plaintiff, as is proper procedure in regional jails throughout the Commonwealth of Virginia and within the Virginia Department of Corrections. She could not appeal since the agency action was never communicated to her.

7

39. As the Corporal who signed the grievance at all times worked under Superintendent Higgs' supervision and direction, his statement that to have restrained Plaintiff during both labor and delivery, even when the inmate poses no threat of violence, indicates that such was the customary practice and procedure at RRJ.

40. In an article dated January 14, 2009, published on Fredericksburg.com, attached as Exhibit "B" hereto, Defendant Higgs admits that "restraints are needed to prevent violent behavior," and that his guards are trained to override a medical directive to remove restraints, saying the following:

> I am not going to compromise the safety of that doctor, his nurse, or my officer by removing restraints on an inmate that causes a problem.

See Exhibit "B." In the case of the particular inmate of whom Superintendent Higgs was speaking, there was no indication that the inmate was ever violent, or was acting in a violent manner.

41. Thus, Superintendent Higgs has admitted that it is his policy that all inmates shall be restrained during medical treatment, whether or not there is a reason to suspect an escape attempt and/or violent behavior.

**COUNT I: EIGHTH AND FOURTEENTH AMENDMENTS AND 42USC§1983**

42. Plaintiff re-alleges Paragraphs 1 through 41 as though set forth in full herein.

43. As applied to Plaintiff, RRJ, through Defendant Higgs', practice and policy of requiring mechanical restraints on pregnant women during transport to the hospital and while in labor, during delivery, and during post-partum recovery, in the absence of a specific and individualized assessment that such women present a substantial flight risk or extraordinary threat to the safety of staff or other detainees, constituted a policy of deliberate indifference to Plaintiff's serious medical needs.

44. To the extent that the actions alleged above were not customary or in compliance with RRJ practice and policy, Defendants Stone, Schoolfield, John Doe 1, John Doe 2, Reed and John Does 3-5, and Jane Does 1-5 are liable in their individual capacities, because a reasonable officer in their positions would have known that shackling a laboring, delivering, and post-partum woman and denying her medical supplies and post-operative pain medications, all contrary to medical orders and/or standards, constitute deliberate indifference to serious medical needs.

45. The acts and of each Defendant, set forth above, were objectively serious as they were incompatible with cruel and unusual contemporary standards of decency.

46. The intentional and reckless decision to permit the shackling of Plaintiff, a pregnant inmate, was done pursuant to RRJ policy as interpreted by Defendant Higgs, and executed by Defendants.

47. The intentional and recklessness of the Defendants regarding the harsh shackling of Plaintiff by Defendants/RRJ guards had no legitimate law enforcement or penological purpose.

48. The acts and omissions of each Defendant were committed with a culpable state of mind in that they were knowledgeable at all times that the shackling of Plaintiff during labor, delivery, and post-delivery was cruel and unwarranted, that this policy, custom, pattern and practice regarding shackling is unlawful and unconstitutional, would likely, and did cause to Plaintiff extreme stress, and put Plaintiff and her child in extreme danger.

49. Plaintiff, at all times during her incarceration, possessed a right under the Eighth Amendment of the United States Constitution to be secure in her bodily integrity, and to be free from excessive force, unnecessary and wanton infliction of pain, deliberate indifference to Plaintiff's serious medical needs or cruel and unusual punishment. Defendants set forth above constituted an invasion of Plaintiff's bodily integrity, excessive force, unnecessary and wanton infliction of emotional and physical pain, and deliberate indifference to her medical needs and risks of injury to Plaintiff and her child. This conduct also violates 42 U.S.C. §1983.

50. The acts and omissions of the Defendants set forth above were committed with deliberate indifference or reckless disregard toward Plaintiff's constitutional rights, health and safety, and caused the damages set forth in the damages paragraph below.

**COUNT II: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

51. Plaintiff re-alleges Paragraphs 1 through 50 as though set forth in full herein.

52. Defendants' above-referenced actions were intentional and reckless.

53. Defendants' above-referenced actions were outrageous and intolerable.

54. As a direct result of Defendants' intentional and reckless conduct in their treatment of Plaintiff during her labor, delivery, and post-partum recovery, Plaintiff suffered severe and permanent emotional damage as described in the Damages paragraph below.

**COUNT III: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

55. Plaintiff re-alleges Paragraphs 1 through 54 as though set forth in full herein.

56. Defendants' above-referenced actions were careless and reckless.

57. As a direct result of Defendants' intentional and reckless conduct in their treatment of Plaintiff during her labor, delivery, and post-partum recovery, Plaintiff suffered severe and permanent emotional damage as described in the Damages paragraph below.

## DAMAGES

As a direct and proximate result of the acts of the Defendants alleged herein, Plaintiff suffered physical pain and mental anguish during labor and delivery and continues to suffer severe injury, including but not limited to, extreme humiliation and embarrassment, fear of serious bodily injury or death to herself and her child, physical injury, including, but not limited to, the risk of miscarriage and death, severe emotional and psychological injury, and the deprivation of her constitutional rights and privileges, including those under the Eighth, and Fourteenth Amendments to the United States Constitution.

## PUNITIVE DAMAGES

Defendants' egregious actions and omissions were done intentionally, willfully, wantonly, and in reckless disregard of their duties under the law and to Plaintiff. Whereupon Plaintiff prays that the Court award punitive damages, so that it will be impressed upon Defendants that such flagrant actions must be immediately rectified and never repeated.

**WHEREFORE,** Plaintiff requests that the Court award to Plaintiff total damages in the amount of **$10,000,000.00** in compensatory damages and **$350,000.00** in punitive damages plus interest from April 18, 2010, to the present.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,

/s/ William G. Shields

William G. Shields (#14200)
Tara D'Lutz (#74515)
THE SHIELDS LAW FIRM, PLLC
11503 Allecingie Parkway
Richmond, VA 23235
Phone: (804) 594-3966
Fax: (804) 594-3855
*Counsel for Plaintiff*