**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| TIARRA FAIN, | : |
| Plaintiff, | : |
| v. | :     3:12-cv-00293 (JAG) |
| RAPPAHANNOCK REGIONAL JAIL, et al. | : |
| | : |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW the Defendants, Rappahannock Regional Jail Authority, Joseph Higgs, Officer Reed, Officer Schoolfield, Officer A. Smith, Officer Stone, Officer Jennifer Gluffra, and Officer Earl Lewis (hereinafter referred to collectively as "Defendants"), by and through undersigned counsel, Alexander Francuzenko, Esq., and the law firm of Cook Craig & Francuzenko, PLLC, and provide the following points and authorities in support of their summary judgment motion.

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1. The following Defendants were not present, nor were they in any way involved in restraining the Plaintiff during labor and delivery: Joseph Higgs, Tina Schoolfield, Officer Reed, Officer Earl Lewis, Officer Jennifer Gluffra[1], and Officer A. Smith.[2]

2. The only Rappahannock Regional Jail Officer present during the actual labor and delivery was Officer Melissa Stone.

---

[1] The proper spelling of Defendant's last name is "Giuffra."
[2] Plaintiff just recently reissued a Summons for Defendant Maria Patterson. It is not clear whether or not Maria Patterson has been served to date.

3. Dr. Chizoba Uzochukwu was the only physician present during Ms. Fain's labor and delivery.

4. Dr. Uzochukwu testified several times under oath that Ms. Fain was not restrained during labor and delivery on April 18, 2010. (Exhibit 1, Dr. Uzochukwu's Deposition, pp. 9-11, 17-18, 39-40.)[3]

5. Ms. Fain's delivery was normal with no complications. (Exhibit 1, Dr. Uzochukwu's Deposition, pp. 8-9; and Exhibits 1, 2 and 3 to Dr. Uzochukwu's Deposition Report.)

6. Plaintiff gave birth to a healthy baby boy. (Plaintiff's Amended Complaint, p. 5, ¶ 25.)

7. Assuming Plaintiff was restrained in some manner (which the Defendants and the doctor dispute), those restraints had no impact on Dr. Uzochukwu's ability to deliver a healthy baby boy. (Exhibit 2, Tiarra Fain's Deposition, p. 70.)

8. Plaintiff concedes that Officer Stone was present during delivery. Furthermore, Plaintiff concedes that neither the nurse nor the doctor asked Officer Stone to take the restraints off during labor and delivery. (Exhibit 2, Fain Deposition, p. 59.)

9. Plaintiff cannot identify one physical injury to either herself or her son caused by the alleged restraints during labor and delivery.

10. The extent of Plaintiff's emotional distress is having frightening visions and dreams regarding her baby being bashed into a wall. (Exhibit 2, Fain Deposition, pp. 102-103.)

---

[3] Tiarra Fain alleges in her Amended Complaint, and in her sworn deposition testimony, that she was restrained in both arms, and left ankle which was in the stirrups during Dr. Uzochukwu's delivery of her baby.

11. The extent of Plaintiff's mental health treatment was three visits to a mental health clinic while incarcerated at Fluvanna Women's Prison. (Exhibit 2, Fain Deposition, p. 128.)

12. Plaintiff has not had any follow-up care for her alleged emotional distress, nor has she taken any medicine for that emotional distress. (Exhibit 2, Fain Deposition, p. 128.)

13. Ms. Fain has had a fairly normal life since returning to society, including holding several jobs, and is currently employed as a chef at TGI Fridays. (Exhibit 2, Fain Deposition, pp. 12-14).

14. At the time of Ms. Fain's delivery, RRJ maintained a policy, entitled "Escorted Trips" (Exhibit 4), which governed situations such as her visit to the hospital.

15. Under that policy, guards could temporarily remove an inmate's restraints "at the request of emergency room medical staff for the purposes of tests, x-ray, or any other hospital protocol" but had to replace the restraints immediately afterward. (Exh. 4, Escorted Trips, at 2.)

16. If an inmate was assigned to a private room, as Ms. Fain was (Exh. 2 at 73:4-13), the Defendants were required to restrain Ms. Fain's wrist and ankle to the bed rail. (Exh. 4. Escorted Trips, at 2.)

17. Even then, they could remove the restraints when "requested by medical staff for the purpose of any medical procedure or to permit the inmate to use the restroom." (Exh. 4, Escorted Trips, at 2.)

**STANDARD OF REVIEW**

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th

Cir. 1997) (citing Fed. R. Civ. P. 56); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Furthermore, once the movant carries his burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate where the facts presented "show that there is no genuine issue as to any material fact and that the moving party is entitled to Judgment as a matter of law." Fed R. Civ. P. 56(c). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case". *Celotex Corp.*, 477 U.S. at 322. In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "It is also true that 'the mere existence of some disputed facts does not require that a case go to trial', rather, '[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict'. *Thompson Everett, Inc. v. Nat'l Cable Adver., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995)." *Poole v. Pass*, 351 F.Supp.2d 473, 478 (E.D. Va. 2005).

## ARGUMENT

I.  **Ms. Fain's Eighth Amendment Claims Fail**

   A.  **Assuming That Ms. Fain Was Restrained During Labor and Delivery, She Has Failed to Establish Deliberate Indifference**

In general, a plaintiff alleging an Eighth Amendment violation must prove that her treatment either caused "a serious or significant physical or emotional injury" or exposed her to "a substantial risk of such serious harm..." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (citations omitted). The plaintiff must prove that the defendant was "aware of facts from

4

which the inference could be drawn that a substantial risk of serious harm exists, and he must also [have drawn] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To establish an Eighth Amendment violation based on a medical condition or treatment, a prisoner must further prove that (1) she had an "objectively serious medical condition" and (2) the defendant was deliberately indifferent to the prisoner's condition. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). "The Fourth Circuit Court of Appeals has held that a medical treatment claim cannot be brought against non-medical personnel unless they are personally involved with a denial of treatment, deliberately interfered with prison doctor's treatment, or tacitly authorized or were indifferent to the prison physician's misconduct." *Lewis v. Angelone*, 926 F.Supp. 69, 73 (W.D. Va. 1996) (citing *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990)).

Ms. Fain has not alleged or established that any part of her pregnancy or delivery was so serious a medical need that it would have been obvious to the Defendants that she had to be unshackled. Ms. Fain alleges that at one point, in the presence of medical personnel, the baby's umbilical cord became wrapped around its neck, but this condition resolved *without* the "emergency cesarean section" which it "almost necessitated." (Am. Compl. ¶ 24.) Ms. Fain does not (and presumably cannot) allege that if doctors had needed to perform an emergency c-section, the Defendants could not have removed the shackles in time. There was no serious physical injury which would support a claim of deliberate indifference; Ms. Fain "gave birth to a healthy baby boy." (Am. Compl. ¶ 25.)

Ms. Fain's expert witness, Dr. Sufrin, also raises the specters of fetal distress, shoulder dystocia, and hemorrhage. (Pl.'s Designation of Experts 5.) None of these conditions arose during Ms. Fain's delivery. Even if they had, the designation fails to establish a *substantial* risk, as required by the Fourth Circuit. For example, Dr. Sufrin merely states that if a patient is

shackled *and* the shackles render medical personnel unable to conduct vaginal exams and place internal monitors on the baby, "then there is a *risk* of causing permanent neurological injury to the fetus, or in some cases even still birth." (Pl's Designation of Experts 5) (emphasis added). Dr. Sufrin is concerned about having to "negotiate" with guards to release restraints, but Ms. Fain has produced no evidence to suggest that if one of those conditions *had* arisen, the Defendants would not have released the restraints in time for the emergency treatment. Dr. Sufrin's expert testimony is pure speculation.

Finally, Ms. Fain has failed to establish a substantial emotional injury, which requires proof of "'a serious…emotional deterioration attributable to' the challenged condition." *Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir. 1990) (quoting *Shrader v. White*, 761 F.2d 975, 979 (4th Cir. 1985)). "A depressed mental state, without more," does not satisfy this standard. *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999) (citing *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). Ms. Fain is able to work and sought only a few counseling appointments following her delivery. (Undisputed Material Facts Nos. 12 and 13.) She claims that the delivery made her afraid of serious injury or death to her or her child, but, fortunately, neither she nor her child suffered any adverse consequences from the delivery, even assuming her shackling claims to be true. Ms. Fain cannot convert ultimately baseless fear and relatively minor emotional distress into an Eighth Amendment claim. The facts revealed in discovery make clear that any emotional injury she suffered was not so serious as to implicate the Eighth Amendment or any viable claim for that matter.

**B.    Even If Officer Stone Violated Ms. Fain's Eighth Amendment Rights, They Are Entitled to Qualified Immunity Because Those Rights Were Not Clearly Established at the Time**

The purpose of qualified immunity is to prevent burdensome litigation involving government officials when undisputed facts warrant the application of immunity. "Qualified immunity is 'an entitlement not to stand trial or face other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "The privilege is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* at 200-01. The intent of applying this privilege is to resolve and dispose of these types of cases as soon as possible in order to save government officials the burden and cost of defending themselves from this type of lawsuit. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991). In *Saucier*, the Court established a two-step process in examining the issue of qualified immunity.[4] The first question that must be addressed is, "taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a Constitutional right?" *Saucier*, 533 U.S. at 201. If the court determines that no Constitutional right was violated, then no further analysis is necessary. *Id.* If a constitutional violation took place, the next step "is to ask whether the right was clearly established." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. "[O]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). This means that the right at issue must have been defined "at a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999).[5]

---

[4] *Pearson v. Callahan*, 555 U.S. 223 (2009), made the two-step process, which was mandated by the Court in *Saucier*, a method that can be used by the lower courts, at the discretion of the lower courts. As a result the two-step process set forth in *Saucier* is no longer mandatory.

[5] For example, in *Edwards*, the "appropriate level of particularity" was "the right of a police officer to express his personal views on a matter of public concern in an off-duty employment

7

The reviewing court need only consider the decisions of the U.S. Supreme Court, Fourth Circuit, and Virginia Supreme Court in determining whether a right was clearly established. *Wilson v. Kittoe*, 337 F.3d 392, 402-03 (4th Cir. 2003) (citations omitted).

Here, the question is whether it was clearly established, on April 18, 2010 (Am. Compl. ¶ 17), that pregnant inmates had the Eighth Amendment right not to be shackled (1) pre-partum while at a public hospital outside the prison (Am. Compl. ¶ 18); (2) during labor and delivery (Am. Compl. ¶¶ 20-24), and (3) post-partum while still at the public hospital (Am. Compl. ¶ 30.) The Fourth Circuit has never decided whether pregnancy, either uncomplicated or complicated, presents a "serious medical need" that implicates the Eighth Amendment.[6] Officer Stone cannot be expected to guess how the Fourth Circuit or Supreme Court would rule on such a complex issue, so the question is whether any reasonable officer would have understood that shackling a pregnant inmate was an Eighth Amendment violation. Such an officer would have to take into account a variety of factors—instructions from medical personnel, prison regulations, their subjective evaluations of the patient's dangerousness and flight risk—to determine whether and how much to restrain an inmate. In fact, the American Medical Association guidance on the issue, which Ms. Fain quotes in her Amended Complaint, reflects this same "it depends" approach, asking whether there are "compelling grounds" to think the inmate is dangerous or a flight risk who cannot be "reasonably contained by other means" and urging the use of "the least restrictive restraints necessary to ensure safety and security." (Am. Compl. ¶ 36). These are

---

setting without incurring discipline from his employer or being threatened with termination motivated solely by the police chief's personal and political zeal to oppose the lawful possession of firearms and because of the police chief's desire to promote his own personal political agenda." *Id.* at 251.

[6] As an initial matter, Ms. Fain does not actually state whether even partial shackling of any pregnant inmate would have been lawful under some circumstances but not hers. The Defendants will assume that Ms. Fain takes the position that all shackling of her was unlawful.

gray areas, not bright lines. *See Maciariello*, 973 F.2d at 298. Further, a reasonable officer would not know that, as Dr. Sufrin contends, shackling increases the risk associated with shoulder dystocia, hemorrhage, or c-sections (none of which occurred). Not only does the Defendants' expert dispute her findings, but specialized knowledge about those risks is not available to correctional officers. Because there was no bright-line rule regarding shackling pregnant inmates, either in the pertinent caselaw or obvious to a reasonable officer, Officer Stone is entitled to qualified immunity.

## C. RRJ's Restraint Policy Does Not Violate the Eighth Amendment

42 U.S.C. § 1983 does not hold governmental entities liable unless they have "an official policy or custom which causes a deprivation of the plaintiff's constitutional or statutory rights." *Brown v. Mitchell*, 327 F.Supp.2d 615, 629 (E.D. Va. 2004) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)). Thus, Ms. Fain must prove that RRJ "had a policy or custom of deliberate indifference to" inmates' Eighth Amendment rights and that the policy caused or contributed to her injury. *See id.* (citing *Westmoreland v. Brown*, 883 F.Supp. 67, 76 (E.D. Va. 1995)). At the time of Ms. Fain's delivery, RRJ maintained a policy, entitled "Escorted Trips" (Exhibit 4 hereto), which governed situations such as her visit to the hospital.[7] Under that policy, guards could temporarily remove an inmate's restraints "at the request of emergency room medical staff for the purposes of tests, x-ray, or any other hospital protocol" but had to replace the restraints immediately afterward. (Escorted Trips 2.) If an inmate was assigned to a private room, as Ms. Fain was (Exh. 4 at 73:4-13), the Defendants were required to restrain Ms. Fain's wrist and ankle to the bed rail. (Escorted Trips 2.) Even then, they could

---

[7] Ms. Fain has not provided any evidence to suggest that RRJ had a custom, distinct from its policy, regarding inmate restraint, or that RRJ failed to take reasonable steps to enforce the policy.

9

remove the restraints when "requested by medical staff for the purpose of any medical procedure or to permit the inmate to use the restroom." (Escorted Trips 2.) The Defendants' conduct complied with the Escorted Trips policy. As discussed above, that conduct also did not violate the Eighth Amendment. The portions of the Escorted Trips policy applicable to Ms. Fain's labor did not violate the Eighth Amendment any more than the Defendants' compliant conduct did. The policy allowed officers to remove an inmate's restraints at the direction of medical personnel. Again, Ms. Fain has no evidence that her shackles could not timely have been removed to address a medical emergency—and, therefore, no evidence that she was exposed to a substantial risk of serious harm. Her expert testimony on this point is pure speculation, and her expert's report does not even describe facts specific to Ms. Fain's condition. She has no evidence that pre-partum shackling was anything but embarrassing. She has no evidence that shackling during labor and delivery (which only she remembers) or post-partum shackling caused any serious or substantial physical or emotional injury to her. In short, Ms. Fain has no evidence that anything in the Escorted Trips policy violated her Eighth Amendment rights.

Likewise, as of April 2010, it was not clearly established in the Fourth Circuit that these procedures would have violated the Eighth Amendment. The Fourth Circuit has never decided whether pregnancy, either uncomplicated or complicated, presents a "serious medical need" that implicates the Eighth Amendment. No caselaw suggested guidelines for when an inmate should or should not have been shackled outside the institution's walls. The Escorted Trips policy gave officers discretion to remove restraints as necessary in consultation with medical staff. Once the need had passed, the policy required officers to re-apply restraints. RRJ obviously attempted, through the policy, to strike a balance between community safety and inmate safety. The law in

April 2010 did not make it reasonably clear that this balance crossed an Eighth Amendment "bright line."  RRJ enjoys qualified immunity for its issuance of the policy.

**II.  Ms. Fain's Claim for Intentional Infliction of Emotional Distress Fails Because She Cannot Establish Outrageous Conduct or Severe Emotional Distress**

Ms. Fain claims intentional infliction of emotional distress ("IIED") by the Defendants.  Such claims are "not favored" in Virginia.  *Ruth v. Fletcher*, 237 Va. 366, 373, 377 S.E.2d 412, 415 (1989) (quoting *Bowles v. May*, 159 Va. 419, 438, 166 S.E. 550, 557 (1932)).  Ms. Fain must prove, by clear and convincing evidence, that "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable in that it offends generally accepted standards of decency and morality; (3) the wrongdoer's conduct caused emotional distress and (4) the emotional distress was severe."  *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999).  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Russo v. White*, 241 Va. 23, 27, 400 S.E.2d 160, 162 (1991) (quoting Rest. 2d Torts § 46 cmt. d (1965)).  "Whether conduct is sufficiently outrageous is, in the first instance, a question of law for the court."  *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir. 1987).  The Defendants' conduct in the light most favorable to Ms. Fain—partially shackling her to the hospital bed, at one point assigning a male to guard her postpartum, and shackling her during trips to the bathroom—was not outrageous.  Ms. Fain was, at the time, incarcerated for crimes she committed.  RRJ permitted her to deliver her child in a public hospital.  The Defendants had to exercise some precautions to ensure that the prisoner under their guard did not escape.  Most importantly, their behavior did not result in any physical harm to Ms. Fain or her child.  The Defendant's conduct was, as a matter of law, not outrageous.

The "severe emotional distress" element requires not just "severe psychological trauma, depression, humiliation, and injury to reputation," but also "that the defendants' actions rendered [the plaintiff] functionally incapable of carrying out any of her work or family responsibilities." *Almy v. Grisham*, 273 Va. 68, 80, 639 S.E.2d 182, 188 (2007). Ms. Fain cannot establish this level of interference with her entire life. She has been able to work and went to counseling only a few times. (Undisputed Material Facts Nos. 12 and 13.) None of her testimony establishes the kind of severe emotional distress that the Virginia Supreme Court required for an IIED claim.

### III. Ms. Fain's Claim for Negligent Infliction of Emotional Distress Fails

#### A. Ms. Fain Fails to State a Claim for Negligent Infliction of Emotional Distress

Virginia recognizes the tort of negligent infliction of emotional distress ("NIED") in certain limited situations. *See Hughes v. Moore*, 214 Va. 27, 34, 197 S.E.2d 214, 219 (1973). Where a defendant behaves negligently but does not cause a physical impact to the plaintiff, the plaintiff may recover for NIED only if she suffers severe emotional distress from the negligence *and* proves, by clear and convincing evidence, that the emotional distress proximately caused physical injury. *Id.* Here, Ms. Fain has failed to adduce any, much less clear and convincing, evidence to suggest that her emotional distress proximately caused *physical* injury to her.

#### B. The NIED Claim Would Be Barred by Sovereign Immunity Even If She Had Stated a Claim

##### 1. RRJ Enjoys Sovereign Immunity

RRJ is a Jail Authority created in accordance with Va. Code Annotated § 53.1-95.2. It comprises several counties and the City of Fredericksburg. For the purposes of sovereign immunity, an "Authority" occupies the same status as the counties that brought it into existence. *VEPCO v. Hampton Redev. Housing Auth.*, 217 Va. 30, 34, 225 S.E.2d 364, 368 (1976). As stated above, the RRJ is made up of several counties and the City of Fredericksburg. Counties

12

are entitled to the same sovereign immunity as the Commonwealth. *Mann v. Arlington County Board*, 199 Va. 169, 174, 98 S.E.2d 515, 518-19 (1957). Cities are entitled to sovereign immunity for the exercise of governmental function, but not for the exercise of proprietary functions. *Transportation, Inc. v. City of Falls Church*, 219 Va. 1004, 1005, 254 S.E.2d 62, 63 (1979) (*per curiam*). RRJ asserts that it should have the same immunity as a county since it is made up mostly of counties and only one city. Notwithstanding this argument, if the Court determines that municipal immunity should apply to the RRJ, the running of the Jail is a governmental function which is protected by the principles of immunity.

RRJ should, at the very least, enjoy sovereign immunity for the exercise of governmental functions such as the operation of a Jail, including the booking, guarding and locking up of inmates. By statute, RRJ is declared an instrumentality exercising public and essential governmental functions to provide for the public safety and welfare. Va. Code § 53.1-95.7. The general purpose of the Jail Authority is to operate a Jail. This is the very type of delegated "governmental function" which Virginia has routinely afforded sovereign immunity.

The Virginia Supreme Court has long held that municipalities are exercising government functions in the operation of a Jail and are entitled to sovereign immunity for claims arising out of the exercise of that function. *Franklin v. Town of Richmond*, 161 Va. 156, 158, 170 S.E. 718, 719 (1933). The touchstone is the "nature of the power and source from which it comes." *Id.* at 161, 170 S.E. at 720.

The nature of the power granted to Jail Authorities such as RRJ and the source from which it comes (the Commonwealth), weigh heavily in favor of a finding of sovereign immunity. RRJ was created in accordance with the statute and is granted powers by the statute. Va. Code § 53.1-95.2; *id.* § 53.1-95.7; *id.* § 53.1-95.17. Moreover, Jail Authorities are subject to significant

13

control by the Commonwealth. The State Board of Corrections sets minimum standards for the construction, equipment, administration, and operation of the Jails. *Id.* § 53.1-68(A). The State Board of Corrections, in conjunction with the Board of Health, sets standards for the sanitation of Jail facilities and is required to perform at least one unannounced health inspection a year. *Id.* § 53.1-68(B). The Department of Criminal Justice Services is required to set minimum training standards for the employees of Jails. *Id.* § 53.1-68(C). The Superintendent of the Jail must make monthly reports to the Director of the State Department of Corrections regarding the prisoners housed at the Jail. *Id.* § 53.1-95.19. If the Superintendent of the Jail fails to meet this requirement, the Director of the State Department of Corrections has the authority to make such a report themselves from the Jail records. *Id.* § 53.1-95.19. The standard operating procedures of the Jail Authorities must be consistent with the standards set by the State Board of Corrections. *Id.* § 53.1-95.20.

The Commonwealth likewise has significant interest in the government function of the activity of the RRJ. The General Assembly has repeatedly articulated important and significant interests it has in the operation of its Jails. As articulated in the Va. Code, the RRJ is considered an instrumentality of the State. *Id.* § 53.1-95.7. Jail Authorities are "necessary for the welfare of the Commonwealth and its inhabitants." *Id.* § 53.1-95.22. Thus, the statutory provisions governing Jail Authorities must be liberally construed to meet that important purpose. *Id.* § 53.1-95.22.

The RRJ is exempt from payment of all local and State taxes. "The exercise of powers granted by this Article shall be in all respects for the benefit of the inhabitants of the Commonwealth, for the increase of their commerce, and for the promotion of their safety, health, welfare, convenience, and prosperity." *Id.* § 53.1-95.15. The significant interest and

involvement of the Commonwealth in the effective operation of its Regional Jails could not be more clearly stated.

The allegations contained in Plaintiff's Amended Complaint clearly reflect that the Plaintiff was being detained in the Jail, and was in the custody of the Jail employees when she was allegedly injured. The function of guarding inmates, especially in public, is a Jail function, one that is covered by the immunity as articulated above, whether or not the Court determines that the RRJ is entitled to the same immunity as a County or municipality. Based on these arguments, the Rappahannock Regional Jail is entitled to the protection of sovereign immunity.

### 2. The Individual Defendants Share RRJ's Sovereign Immunity

Even if Ms. Fain had established NIED, sovereign immunity would have protected the Defendants because whether and exactly how much restraint to use on a pregnant inmate involves the exercise of discretion. In Virginia, government employees enjoy sovereign immunity for negligence in all discretionary (as opposed to ministerial) actions. *Colby v. Boyden*, 241 Va. 125, 128, 400 S.E.2d 184, 186 (1991). Four factors determine whether an action is ministerial: "(1) the nature of the function the employee performs; (2) the extent of the government's interest and involvement in the function; (3) the degree of control and direction exercised over the employee by the government; and (4) whether the act in question involved the exercise of discretion and judgment." *Id.* (citing *Messina v. Burden*, 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984)).

The Virginia Supreme Court has not considered the particular question of shackling an inmate in labor, but the facts here make clear that the decision was discretionary. First, jail officers, by the nature of their jobs, make a variety of judgment calls on a daily basis. They decide whether and when to intervene in tense situations, how much force to use in doing so, and

whether to discipline inmates for various infractions. They do not follow policy manuals which dictate their every move in every possible scenario. Second, the operation of a jail, and the control of its inmates, is a classic governmental function, not a matter for the private sphere. *See Franklin v. Town of Richlands*, 161 Va. 156, 158, 170 S.E. 718, 719 (1933). Third, the jail can only maintain so much control over jail employees when they are supervising an inmate on the grounds of a non-jail hospital. The guards must operate with relative autonomy outside the familiar correctional context. Finally, the specific decision to restrain Ms. Fain in a certain way is a matter of discretion, not rule. For example, Officer Giuffra testified that while policy required one leg and one arm to be restrained after delivery, the guard had to "remove restraints as needed" depending "on the medical situation" during active labor, in consultation with the medical staff. (Exhibit 3, Giuffra Depo. 9:5-10:6.) No specific policy governed which kind of treatment required the restraints' removal; rather, if the restraints "interfered with IVs or anything special that was attached to the arm", then the guards would remove the restraints. (Exhibit 3, Giuffra Depo. 12:3-9.) This kind of discretion, exercised in conjunction with medical staff's expert opinions, reflects discretion in the guards' ability to determine when to remove and reattach restraints. Like an officer in a high-speed chase, as *Colby* described, they must make "prompt, original, and crucial decisions in a highly stressful situation." 241 Va. at 128, 400 S.E.2d at 187. They therefore share RRJ's sovereign immunity for negligence, including NIED, arising from the discretionary act of shackling Ms. Fain.

**IV.    In Light of the Testimony of Ms. Fain's Own Obstetrician, No Reasonable Jury Could Credit Ms. Fain's Testimony That She Was Shackled during Labor and Delivery**

The mere fact that Ms. Fain remembers having been shackled during delivery does not create a dispute regarding that material fact.

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (video evidence contradicted party's testimony). Here, only Ms. Fain recalls having been shackled during delivery. The various officer witnesses do not recall it. This Court, relying on that contradictory testimony alone, might well find a dispute over that fact. But even Ms. Fain's own obstetrician, Dr. Uzochukwu, testified that she was not restrained during delivery:

    A.    During the delivery, I do remember that she was not restrained.

(Uzochukwu Depo. 40:1-2.)

Dr. Uzochukwu is an independent eyewitness who specifically recalls that Ms. Fain was not restrained during the labor and delivery process. (Undisputed Material Fact No. 4.) Dr. Uzochukwu has absolutely no motive to perjure herself or protect any of the Defendants. If anything, her loyalty would lie with Ms. Fain, her patient. Yet Dr. Uzochukwu testified under oath, based on independent recollection, that Ms. Fain was not restrained during the time period at issue. Furthermore, all of the medical records produced by Dr. Uzochukwu and the hospital reflect that there were no restraints during labor and delivery. (Exhibits 1, 2, and 3 to Dr. Uzochukwu's deposition.) No reasonable jury could credit Ms. Fain's testimony to the contrary in light of this overwhelming evidence. With no facts to support her claim of shackling, her Eighth Amendment claim fails as a matter of law.

## **CONCLUSION**

This Court should award the Defendants judgment as a matter of law.

                                              Respectfully submitted,

                                        _____/s/_____
Alexander Francuzenko, VSB 36510
Attorney for Defendants
Cook Craig & Francuzenko, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
Phone (703) 865-7480
Fax (703) 434-3510
alex@cookcraig.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of February, 2013, I served a copy of the foregoing Memorandum of Law in Support of Defendants' Motion for Summary Judgment via ECF transmission to:

William G. Shields, Esq.
Tara D'Lutz, Esq.
The Shields Law Firm, PLLC
11512 Allecingie Parkway, Ste. C
Richmond, VA 23235

_____/s/_____
Alexander Francuzenko, VSB 36510
Attorney for Defendants
Cook Craig & Francuzenko, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
Phone (703) 865-7480
Fax (703) 434-3510
alex@cookcraig.com