IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

- - - - - - - - - - - - - - - x

TIARRA FAIN, :

Plaintiff, :

vs. : CASE NO. 3:12-CV-293

RAPPAHANNOCK REGIONAL JAIL, :

et al., :

Defendants. :

- - - - - - - - - - - - - - - x

Deposition of SUPERINTENDANT JOSEPH HIGGS, JR.

Stafford, Virginia

Tuesday, February 12, 2013

2:27 p.m.

Job No.: 32439

Pages: 1 - 53

Reported by: Sarah M. Bickel, RPR

PLAINTIFF'S EXHIBIT A

P R O C E E D I N G S

JOSEPH HIGGS, JR.

having been first duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. SHIELDS:

Q Would you state your name, please, for the record.

A Joseph Higgs, Jr.

Q And you are the superintendent of the Rappahannock Regional Jail; is that correct?

A Yes.

Q And you were in April of 2010?

A Yes.

Q Any changes in your position from then to now?

A No.

Q As superintendent, can you tell me what your responsibilities are?

A I oversee the full operation of the regional jail here. I have command staff that -- I break it down, I delegate some of that responsibility to them and they report back to me, and I monitor

A Yes.

Q And what standards are those, if you can think of them offhand?

A They're the most recent standards that were set forth this past year in Richmond. That's what our policies comply to.

Q Going back to April of 2010, can you tell me what policies were in place then?

A They were not as restrictive as the current policies are.

In relationship to pregnant females, is that what you want?

Q That's right. Yes.

A In what relation? Transport? Housing?

Q I'm thinking about transport and what occurs while they're in the hospital or whatever location they're delivering.

A And that's from April '10?

Q In April of 2010.

A In April of 2010, the policy and procedures, there was no, at that time, separate policy pertaining to pregnant females other than --

different than that of regular inmates. Pregnant females were transported. They were restrained generally in the front. They were -- had what they call leather restraints on their ankles.

If they were transported -- let's see what's the policy -- if they were transported by rescue on a gurney, their one arm was restrained or one leg was restrained to the gurney. If they were transported by our vehicles to the hospital, the restraints remained the same because they would be sitting in the vehicle and the only other restraint that would have been placed on them would have been the seat belt.

Q Do you remember the specific name of the policy in question or the number of it or whatever it is?

A No, but I can get it for you.

Q That's okay. I'm just asking if you know offhand.

A My policy book is (indicating) --

Q I'm sure. Now --

MR. FRANCUZENKO: Just for the record, I

is, I believe, after the birth of Ms. Fain's baby, if that's what you're getting at.

Q So the copy of 3110 that I've shown you --

A This one (indicating)?

Q Yes.

A That wasn't in effect.

Q -- that wasn't in effect? That had been superseded?

A Right.

Q And then the one I've just shown you, 3114, is a new policy that came in afterwards?

A October of '10. This has since changed, too.

Q And let's try one more just to be -- we've got 31- --

A You should have one that's '09.

Q 3115, see if that one was in effect.

A This one went into effect January 20th of '11. That's when that revision went into effect.

Q So none of the ones I've shown you were in effect at the time?

A Are you talking about in effect at the

Q It says, The inmate is to be transported with wrist or ankle restraints. If a jail vehicle transports the inmate, full restraints are applied when physically permissible; am I correct?

A Uh-huh.

Q Restraints may be temporarily removed at the request of emergency room medical staff for the purposes, tests, X-rays, or other hospital protocol. Restraints are to be reapplied immediately following any procedure. Inmates are not permitted to use -- to make telephone calls or visitors, correct?

A Correct.

Q That was the policy in effect in of April of 2010?

A (Nonverbal response.)

Q Now, it says, May be temporarily removed.

Who would make the decision to remove or not remove according to the policy?

A Medical staff.

Q Medical staff?

So the officer would not have the ability to tell the medical staff, I'm not going to do that,

minimum shall be shackled wrist or ankle to the bed rail using leather restraints.

A Correct.

Q That was the policy; is that correct?

If you would, there's a policy -- under assignment to private room, third paragraph, would you read that, please?

A You're talking about leather restraints?

Q Yes.

A -- are to be applied at a minimum to the wrist and ankle and to the bed rail. Restraints are not to be removed unless requested by medical staff for the purpose of any medical procedure or to permit the inmate to use the restroom. Under both circumstances, the inmate is to be closely supervised by the jail officer and restraints applied immediately thereafter.

Q And that was the policy in place at the time?

A That was the policy.

Q And then under restraint equipment, does it say what kind of restraints are supposed to be in

dangerous may be different than mine, but the fact -- no.

Q There weren't -- let me go back.

Did she have a history of violent crimes?

A She had a history of criminal activity on the outside, yes.

Q But not -- but were the crimes violent?

A Are you asking me -- what?

Q I guess what I'm trying to figure out is where she ought to be pigeon-holed.

Was she in any way an unusual risk in terms of the danger to people or the flight risk or any of that? I'm sure all prisoners are, to some degree, flight risks and all prisoners, to some degrees, pose some level of dangerousness, but --

A Well, you just answered my question.

Q Beyond that, did she have any history of violence that you know of?

A I know of none.

Q And you don't know of any escape attempts that she made or anything of that nature?

A No.

Q And what was his title again?

A He's lieutenant colonel deputy superintendent.

Q Did any of the officers report a specific recollection of unshackling Ms. Fain before delivery, to your knowledge?

A Repeat --

Q Did any of the officers report that they had a specific recollection of un- -- of taking restraints off of Ms. Fain prior to her delivery?

A I couldn't answer that, sir. I don't know.

Q Did Phil Grimes, in reporting to you -- Lieutenant Colonel Grimes, did he report to you that officer so and so, being anybody, said that officer knew for sure she was not restrained during delivery?

A No. The only thing that I recall from the conversation with the lieutenant colonel was that Ms. Fain was not secured to anything during delivery, and the doctor's statements verified that.

Q And when did you have this conversation with Lieutenant Colonel Grimes?

A I'm not sure. When he was still in the process of finishing the paperwork up on his investigation, I wanted to know if she had been restrained, as the complaint was made to us, and he told me she had not.

Q Other than the doctor, did he say anybody else confirmed that?

A No. I didn't go into detail. That was his investigation. He assured me that there was no restraints, and that was my immediate concern.

Q And did he assure you that there were no restraints over what period of time?

A While she was in delivery.

Q Just while she was in delivery?

A Yes.

Q Did he say how long a period of time that was?

A He did not.

(Discussion off the record.)

BY MR. SHIELDS:

Q Then for 3114, this one is correct; is that right?

A No. He didn't tell me that, no.

Q Would that have been an important factor, given this lawsuit?

A Well, at the point in time we were doing this investigation, there was no lawsuit.

Q Did he tell you what triggered the removal of the restraints?

A Medical staff would either ask the officers to take the restraints off or the officer themselves may have taken the restraints off.

Q But he didn't tell you one way or the other?

A If he did, I don't recall. He's very thorough in his investigation, and he knows the details I'm looking for.

Q So his report was not made in response to the litigation; is that correct?

A His report was made at my request in response to a complaint we received of her being shackled, I believe was the term used, during delivery.

MR. SHIELDS: I would ask for production

seen this. Sir, I don't recall seeing this before. I may have, flipping through paperwork. I mean, it's not our jail procedure to restrain pregnant female while giving birth.

Q One of the -- the reason, obviously, that I'm asking is the response says, Even though you are pregnant, you are still considered an inmate, and we have to take precautions.

A Yes.

Q I would have thought if she was not restrained, that the answer would have contained that information as well, that, Well, you weren't restrained at the time.

A Well, you would like to see it contain that, yes, but Corporal Coleman wrote that in response to that. It was a quick response to her. I would have given a little more response detail, yes, but nonetheless, he responded in the way he did.

MR. SHIELDS: Let me go ahead and mark that as, I guess, Higgs Exhibit 4.

(Higgs Exhibit 4 was marked for identification and attached to the deposition

Defendant Higgs does not have firsthand knowledge with regard to each and every restraint. Incident reports from the officers have been produced to you.

Q Now, you had a recollection about transport.

Would it be the same here, the handcuffs and the leather restraints?

A That's normal -- normal procedure.

Q So far as you know, that's what was used at the hospital except for the period --

A Normal procedure, I would say, was what was used at the hospital.

Q And then No. 14?

A Please identify the form or forms of restraints used on the plaintiff during active labor and delivery.

Same response. Defendant Higgs does not have firsthand information.

Q All right. And other than what you've just told me, you still don't know; is that correct? Other than what Lieutenant Colonel Grimes reported

about what the doctor said, that's the only knowledge you have?

A Right.

Q None of the guards have specifically said, I took them off?

A I did not talk to any of the correctional officers.

Q But nobody has reported any of the guards saying, I took them off?

A Not to me.

Q Now, if you would look at No. 16, please.

A State each and every penological interest upon which the defendant relies and the facts supporting -- I guess that's facts -- supporting the application of that of these penological interest in this case.

Defendant maintains the inmates must be reasonably restrained while outside the Rappahannock Regional Jail.

Q Is there any other penological interest that I should know about, or is that it?

A I'm not sure I understand.

Q Yes.

A No.

Q I'll show you your answer to this suit and ask you to look at paragraph number 3 and read that in, if you would.

A Defendant admits that he is responsible for establishing the policies of the Rappahannock Regional Jail "RRJ." Defendant does not directly train nor does he directly supervise the defendants or the jail employees. Defendant denies that he had the -- "the sole discretion" to dictate the manner in which defendants or other guards would implement the customs and practices of RRJ concerning the care and treatment of pregnant inmates, including plaintiff.

Q Am I correct that you had the ability to set the outline of the policy?

A Yes, I set the outline of the policy.

Q And then they have some leeway in how they interpret it; is that correct?

A I allow my officers a lot of discretion, yes.

Q All right. And if you --

A Commonsense discretion, let me clarify that.

Q If you would look at Number 40, please.

A Forty?

MR. FRANCUZENKO: Paragraph 40?

MR. SHIELDS: Yes.

BY MR. SHIELDS:

Q While you're looking for that, I take it within that discretion, then if they exercise their discretion to do something that is in variance with the policy but it's a commonsense deviation, that would still fall within the proper performance of their duties?

A If you're asking me that if they go beyond the policy and not obey the policy using their discretion, they have to have justification for doing that. If their justification satisfies in my mind as to what they did that allowed them to go beyond the policy, then there would be no disciplinary type of action taken. If the justification, their statement of commonsense and I didn't agree with it and they knew -- I knew they knew better, then there would be

some.

Number 40: The defendant admits that he was quoted in the article dated January the 14th, which -- 2009, which was published well before the alleged incident. Defendant denies the characterizations, interpretations provided by plaintiff's counsel.

Q I'll show you a copy of that article and ask if you have seen that before.

A Yeah, I've seen this.

Q Are you correctly quoted in there?

A Where am I quoted?

Q Take your time and read the whole thing if you'd like.

A If that's the quote you're looking for, yes, I said that.

Q Would you read the one you're talking about?

A The superintendent of the regional jail of Stafford County said that restraints are needed to prevent violent behavior. I -- this is in reference to the doctor -- I respect his office policy, said

Joseph Higgs, but I'm not going to compromise the safety of that doctor, his nurse, or my officer by removing restraints on an inmate that may well have created a problem.

Q So it is your position that under certain circumstances, it would be permissible to have a pregnant inmate restrained, or not?

A If the pregnant inmate was acting in a manner of -- behavior was of such that they were creating a safety or security factor -- risk, yes.

Q Do you remember the situation with Dr. Burke?

A Is he a dentist?

Q It says obstetrician/gynecologist.

A I don't know who Dr. Burke is.

Q Do you remember in what context these statements were made?

A I received a phone call from the newspaper stating that this doctor had made that statement.

Q That one of your guards had refused to remove the --

A Yeah. What the story -- what the

One, while being transported, pregnant females will only be restrained from the front using metal restraints only; two, if admitted to the hospital, the inmate will be restrained to the hospital bed using leather restraints to the left or right arm for safety and security; three, prior to giving birth, restraints will be removed. Four, after birth and all medical procedures are completed, the leather restraints will again be applied to the left or right arm; five, prior to release from the hospital, full leather restraints will be applied.

BY MR. SHIELDS:

Q That's the new policy; is that correct?

A No. There's one after this one.

Q Well, let's talk about that one.

Did you participate in the changing of that Paragraph 9?

A Yes, I did.

Q And how was it changed from the earlier policy?

A Because if you look at the earlier policy, it didn't spell it out as clearly as this one does.

Q Is this actually a change in policy or just clarifying the original policy?

A Anytime you take the old policy and put to it or take from it or clarify, it becomes a new policy.

Q Thank you very much.

MR. SHIELDS: Let's go ahead and mark that as Higgs 6 [sic].

(Higgs Exhibit 5 was marked for identification and attached to the deposition transcript.)

(Discussion off the record.)

BY MR. SHIELD:

Q One thing I think I've already asked, but I just want to make sure.

None of your officers ever told you or it was reported to you from some other source that they did or did not restrain this lady during delivery except for the doctor; is that correct?

A That's correct.

Q The only source of that information is the doctor?

| RAPPAHANNOCK REGIONAL JAIL<br>Stafford, Virginia | Policy Number<br>3.1.15 | Page(s)<br>5 |
|---|---|---|
| INSTITUTIONAL OPERATIONS<br>Security and Control | Related Virginia Standards<br>5.28 | Related ACA Standards<br>3-ALDF-3A-16, -17 |
| Escorted Trips | | |

**POLICY**
The Rappahannock Regional Jail provides certified Jail Officers to escort and supervise inmates when they are transported outside the Rappahannock Regional Jail and/or from one jurisdiction to another.

**DISCUSSION**
Transportation of inmates outside the confines of the Rappahannock Regional Jail provides a most likely opportunity for inmate escape. Consequently, Jail personnel involved in conducting or supervising transportation must be especially alert to possible dangers. In planning transportation activities:

- Careful consideration should be given to selecting a route, which presents the least possibility of difficulty.
- Neither the inmate, his/her family, nor the public should be aware of the time of departure or the proposed route prior to a trip.
- Routes and times of departure should be changed periodically so that inmates cannot detect a pattern.
- Inmates are not permitted to make telephone calls prior to transportation.

**PROCEDURES**
In order to reduce the likelihood of escapes or other serious problems during transportation, it is important that proper planning, training, and orientation be conducted prior to the trip.

- Each trip is handled by a minimum of one (1) Jail Officer.
- Handguns are carried on the opposite side of the body from inmates at all times.
- Consumption of alcoholic beverages by Jail Officers or inmates is strictly prohibited.
- Prior to all transportation, the Movement Officer is made aware of the custody classification of inmates involved and other pertinent data, including past escapes.
- To the greatest extent possible, transportation is conducted during daylight hours.
- Prior to departure, all inmates are given, at a minimum, a pat "frisk" search (see Policy 3.1.19, Inmate, Employee, and Visitor Searches.)
- Inmates being permanently reassigned to another institution or facility are transported with all personal property, unless otherwise specified. Prior to transport, such property must be inventoried and thoroughly searched.
- Inmates are not permitted to possess or spend any funds while in transit.
- Inmates are not permitted to trade or give anything to the Movement Officer(s) or to anyone else.
- Inmates are not permitted to select eating places, routes of travel, rest stops, or in any manner influence the itinerary of the return trip.
- Movement Officers are not to discuss personalities, itinerary, inmate movements, or other official business in the presence of inmates, nor are they to offer legal advice or suggest legal actions to inmates.
- Inmates are not permitted to converse with anyone except the escorting Officer(s) while in transit.
- Inmates are not permitted to make telephone calls or mail letters while in transit, nor are the escort(s) to perform these services for them.
- Except under unusual circumstances, rest stops in transit are limited to one every three hours at previously scheduled locations along the route. These scheduled locations are institutions or jail facilities en route.
- Handcuff and leg iron keys are not carried on the same ring as the motor vehicle ignition or other general use key rings.
- Gasoline credit cards are provided to Movement Officers.
- Escorting an inmate by vehicle should normally be terminated after eight (8) hours of driving time per Movement Officer making the trip. This should equal approximately 400 miles per day. Only when extenuating circumstances exist is this limit to be extended to a maximum of ten hours' travel time.
- Movement Officers returning from an interstate retake of an escapee, after more than 36 hours of continuous duty, are granted appropriate rest time on the day following their return.

EXHIBIT
Higgs 1
2/12/13
SB

- Prior to each trip, Movement Officers check their radio equipment and maintain radio contact during the trip with the host institution, receiving institution, or other institutions along the route.
- Officers of either sex may conduct transportation.
- Movement staff are issued cellular phones to contact the facility on long transports (see Policy No. 1.4.2, Telecommunications).

See Policy No. 1.3.7, Standards of Conduct.

**Funeral Trips**
When there is a death in an inmate's family, the Programs Coordinator is to be notified. The staff member completes the Death Notification/Escorted Trip Request Form (see attached form) and verifies the reported information with the funeral home. This form is forwarded to the inmate's Correctional Counselor for record review, verification of the inmate's relationship to the deceased, and custody status of the inmate. The Correctional Counselor recommends approval or disapproval of the trip and forwards the form to the Director of Security & Confinement for final approval or disapproval. If approved, the Director of Security & Confinement directs the Movement Section to conduct the trip in accordance with standard operating procedures. If disapproved, the Director of Security & Confinement informs the Director of Community Corrections & Programs, who is responsible for notifying the inmate of the disapproval and the reasons for disapproval. Approval or disapproval of a funeral trip is based upon the safety and security of the community, staff, and inmate.

If approved, the inmate is allowed to go to the funeral home prior to the family's viewing to pay respects. The time is to be coordinated between the funeral home and the Movement Supervisor.

**Hospital Trips - Emergency Room Treatment**
When the need arises to transport an inmate to a non-secure hospital, an armed certified Jail Officer directly supervises the inmate.

If the inmate is transported by rescue squad, the inmate is to be secured to the gurney by the wrist(s) or ankle(s), using restraints whenever possible. If a Jail vehicle transports the inmate, full restraints are applied when physically permissible. Restraints may be temporarily removed at the request of the emergency room medical staff for the purposes of tests, x-ray, or any other hospital protocol. Restraints are to be reapplied immediately following any procedure. The inmate is not permitted telephone calls or visitors.

The Superintendent must approve requests from the attending physician for permanent removal of restraints. In the event the inmate in question has a violent history or background or has been combative, at a minimum, the inmate is to be shackled at the wrist or ankle to the bedrail using leather restraints.

**Assignment to Private Rooms**
Any inmate assigned to a room in a non-secure hospital is under the direct supervision of an armed certified Jail Officer. Inmates are not allowed telephone calls or visitors (unless approved by the Watch Commander or his/her designee). The telephone is to be used by the Officer strictly to communicate with supervisors.

Jail Officers are prohibited from bringing personal laptops, cell phones or pagers into the hospital room while they are assigned a security detail for a hospitalized inmate. Staff is authorized to bring with them the following items: books, training manuals or magazines to read.

Leather restraints are to be applied, at a minimum, to the wrist and ankle and to the bed rail. Restraints are not to be removed unless requested by medical staff for the purpose of any medical procedure or to permit the inmate to use the restroom. Under both circumstances, the inmate is to be closely supervised by the Jail Officer and restraints applied immediately thereafter.

Inmates are to be directly supervised at all times during hospital stays. Certified Jail Officers are not to be relieved by hospital security officers; only other certified Jail Officers can relieve them. Relief must be provided at least every Six (6) hours for each officer assigned to hospital duty. There will be no exceptions to this directive. Relief is to be defined as relief of duty by a certified Jail Officer for at least twenty minutes, or for the duration of the 12-hour shift, which would be six (6) hours.

The Watch Commander is to notify hospital personnel not to release any information indicating that an inmate is a patient at the hospital.

Any family member inquiring about a hospitalized inmate is to be referred to the jail's Medical Department.

**Restraint Equipment**

Inmates are restrained in the following manner:

- Minimum custody inmates are restrained, at a minimum, in handcuffs, waist chain, and leg irons unless otherwise specified by the Director of Security & Confinement. These inmates are also maintained under direct supervision at all times.
- Medium and maximum custody inmates are restrained, at a minimum, in handcuffs, waist chains, and leg irons. Additional restraints may be applied if needed.
- Physical restraints are not removed from any inmate while outside the confines of the Rappahannock Regional Jail unless there is an armed certified Jail Officer present.
- Inmates are not secured to the vehicle except by use of a seat belt.
- Restraining equipment must never be used as punishment or in a way that causes undue physical pain or restricts the blood circulation or breathing of an inmate.

**Movement Vehicles**

Movement vehicles used by the Rappahannock Regional Jail will be equipped with a special security screening between the inmates and driver. Officers occupy front seat(s), with the inmate(s) riding in the rear.

- All movement vehicles are to be examined frequently for hairpins, coat hangers, soft drink bottles, chewing gum, paper, matches, and other seemingly insignificant items that could be used in shimming, jamming, or picking handcuffs, or used as a weapon.
- All transportation vehicles are to be equipped with a working two-way radio (See Policy No. 1.4.3, Intercom and Radio Use.)
- Transportation vehicles are never to be operated at speeds in excess of the posted speed limit unless in an emergency situation (See Policy No. 1.3.11, Use of Facility and Personal Vehicles.)
- Shotguns are carried only under the direction of the Superintendent or Director of Security & Confinement.
- If a vehicle is mechanically disabled during transport, the driver will attempt to move the vehicle out of traffic lanes and into a safe area. Arrangements must be made to accommodate the inmate(s) and to provide for their security while they are being transported within the community. The Maintenance Department arranges for repairs.

**Loading**

When transporting inmates in a Jail vehicle, the seat closest to the security screen is to be left vacant. All inmates sit in the second, third, or fourth seat. The only exceptions are:

- If more than ten inmates of the same sex are being transported;
- If both male and female inmates are being transported, males and females must be segregated in the vehicle by an entire bench seat when possible.

**Meals on the Road**

- The inmate eats in the vehicle.
- Restraining devices are to remain in place.
- Food not requiring eating utensils and cold (without ice) drinks are appropriate for the inmate.

**Emergency Procedures**

Accidents: If a transport vehicle is involved in an accident, the Movement Officer(s) should:

- Contact State Police on S.I.R.S. or at 1/800/572-2260.
- Contact Rappahannock Regional Jail on radio or at 1/540/288-5245.
- Document time of accident, location of accident, persons involved, how accident occurred and the time when State Police, rescue squad, and facility were notified.
- Notify local rescue squad if anyone is injured due to accident and insure medical attention is rendered to those in need.
- In the event two or more inmates must be transported to the hospital, the transporting Officer remains with the uninjured inmate(s). Assistance from state and local authorities is requested to insure the safe and secure

transportation of those inmates injured to the hospital. The Rappahannock Regional Jail should also be notified so that an Officer(s) can be dispatched to the scene of the accident and/or hospital.

- If a Movement Officer(s) observes an accident or comes upon an accident, he/she should notify the State Police on S.I.R.S. or at 1/800/572-2260.

**Escapes**
In the event that an escape occurs, the Officer in charge of the trip immediately notifies the Rappahannock Regional Jail by radio or telephone of the name of the escapee, sex, race, age, clothing description, personal description (hair color, length, eyes, scars, etc.), direction of travel, whether armed (if so, type of weapon), and time of escape. This Officer is also responsible for documenting all of the above. See Policy No. 3.2.4, Escape Plan.

**Cross Reference**
Policy No. 1.3.7, Standards of Conduct
Policy No. 1.3.11, Use of Facility and Personal Vehicles
Policy No. 1.4.2, Telecommunications
Policy No. 1.4.3, Intercom and Radio Use
Policy No. 3.1.10, Use of Restraints
Policy No. 3.1.19, Inmate, Employee, and Visitor Searches
Policy No. 3.1.20, Reporting Institutional Incidents
Policy No. 3.2.4, Escape Plan

RAPPAHANNOCK REGIONAL JAIL

# DEATH NOTIFICATION/ESCORTED TRIP REQUEST

NAME OF INMATE: ______________________ BLOCK: __________

NOTIFIED BY: ______________________ DATE: __________

NAME OF DECEASED: ______________________ DATE OF DEATH: __________

RELATIONSHIP TO INMATE: ______________________

FUNERAL HOME: ______________________ CONTACT: __________

ADDRESS: ______________________ TEL: __________

INFORMATION VERIFIED BY: ______________________

DATE AND TIME OF VIEWING: ______________________

ADDRESS: ______________________

TEL: ______________ DIRECTIONS: ______________________

______________________________________________

---

OFFENSE: ______________________ STATUS: __________

SENTENCE: ______________________ ESCAPE HISTORY: __________

DETAINERS/PENDING CHARGES: ______________________

## CLASSIFICATION OFFICER'S RECOMMENDATION

_____ APPROVAL

_____ DISAPPROVAL

______________________
Signature

## DIRECTOR OF SECURITY & CONFINEMENT

_____ APPROVAL

_____ DISAPPROVAL

______________________
Signature

cc: Records Department
Movement Section
Programs Coordinator
Director of Community Corrections & Programs

# RAPPAHANNOCK REGIONAL JAIL
## Inmate Request Form

Inmate's Name: Tiarra Fain
Alias, If used: n/a
Housing Unit: C1-2 Date: 6'8'10
ID #: 20074638 SSN: –

What is your request? Is it "jail procedure" to restrain pregnant women to the bed during labor and delivery? I ask because it seems a little unethical and it was done to me during my childbirth on 4/18/10. I am not violent, and have never given officers any reason to feel like I was dangerous. I'm very respectful. But during labor, a woman is unable to walk. Faith Robinson stated that she wasn't restrained. So why was I?

**DO NOT WRITE BELOW THIS LINE**

Security ( ) Programs ( ) Community Corrections ( ) Support Services ( ) Other
Received by Officer: Olson
Date: 06-9-10 Time: 0834
Action Taken: Even though you are pregnant you are still considered an inmate and we have to take precautions.

Completed By: [signature]
Date: 6/9/10 Time: 1040

Date Received by Case Manager:
Date Returned to Inmate:

White – Inmate File
Yellow – Inmate
Pink – Inmate Response Copy




PROG-0024
Revision 6/04

# Shackles not what doctor ordered

**A Fredericksburg doctor this week refused to treat a handcuffed inmate**

*Date published: 1/14/2009*

BY JIM HALL

When Dr. Declan Burke, a Fredericksburg obstetrician/gynecologist, walked into his exam room Monday, he discovered that his patient, a female jail inmate, was in handcuffs.

"Please take off the manacles," he said to the correctional officer who was with the inmate.

"No, I can't," the guard replied.

Burke insisted, so the officer called her supervisor at the Rappahannock Regional Jail. The supervisor agreed with the officer. The handcuffs would remain in place during the exam.

Burke said he wanted the handcuffs removed to examine the patient completely. It was the first time in 20 years that he has refused to treat a jail inmate.

The superintendent of the regional jail in Stafford County said that restraints are needed to prevent violent behavior.

"I respect his office policy," said Joseph Higgs, "but I am not going to compromise the safety of that doctor, his nurse or my officer by removing restraints on an inmate that may well have created a problem."

Health workers must sometimes restrain unruly patients. But what about the patient who arrives for treatment in shackles? Can a doctor insist that they be removed?

Several hospitals, state legislatures and departments of corrections nationwide have debated the shackling of pregnant inmates during labor and delivery.

At Mary Washington Hospital's emergency department, prisoners from the Rappahannock Regional Jail are not shackled while being treated.

"The handcuffs are removed, and a prison guard sits one-on-one with the patient," said Kathleen Allenbaugh, hospital spokeswoman.

When state inmates are taken for medical care, the decision whether to shackle during treatment is made on a case-by-case basis, said Larry Traylor, spokesman for the Virginia Department of Corrections.

"Several factors come into play," Traylor said in an e-mail. "The most significant being the offender's history of behavior. When possible we will consider removal of either the handcuffs or the leg irons depending on the area that requires treatment."

Burke described his patient as a "small, frail-looking woman" in her 30s. He said he did not know her criminal history. She was there because of complications of a hysterectomy.

Burke said the guard removed the prisoner's leg shackles for the pelvic exam. He also said he wanted the handcuffs removed to do a breast exam.

With the handcuffs in place, "I could have done a limited exam. I couldn't have done the adequate exam I wanted to do," he said.

EXHIBIT
Higgs 5
2/12/13 SB

Burke said he did not fear for his safety. His nurse and the guard were in the room.

The guard and inmate eventually left Burke's Central Park office without the inmate being treated.

Higgs said the jail's policy is consistent for all prisoners, male or female, sentenced or accused.

"Normally, when we take them out into the community, even to funerals, they remain cuffed," Higgs said.

Burke's patient had been convicted in Stafford County and had a history of violence, Higgs said.

"The doctor has no knowledge of the history of this inmate at this facility. We do," he said.

The inmate will see another doctor and will be handcuffed during the exam, he said.

Jim                                    Hall:                              540/374-5433
Email: jhall@freelancestar.com

EXHIBIT
Higgs 6
2/12/13 SB

| RAPPAHANNOCK REGIONAL JAIL<br>Stafford, Virginia | Policy Number<br>3.1.15 | Page(s)<br>5 |
|---|---|---|
| INSTITUTIONAL OPERATIONS<br>Security and Control | Related Virginia Standards<br>5.28 | Related ACA Standards<br>3-ALDF-3A-16, -17 |
| Escorted Trips | | |

I. **PURPOSE**

The Rappahannock Regional Jail provides certified Jail Officers to escort and supervise inmates when they are transported outside the Rappahannock Regional Jail and/or from one jurisdiction to another.

II. **SCOPE**

This policy applies to all Rappahannock Regional Jail employees.

III. **DEFINITIONS**

A. **Escort:**

To accompany as an escort.

IV. **PROCEDURES**

A. **DISCUSSION**

1) Transportation of inmates outside the confines of the Rappahannock Regional Jail provides a most likely opportunity for inmate escape. Consequently, Jail personnel involved in conducting or supervising transportation must be especially alert to possible dangers. In planning transportation activities:

a. Careful consideration should be given to selecting a route, which presents the least possibility of difficulty.
b. Neither the inmate, his/her family, nor the public should be aware of the time of departure or the proposed route prior to a trip.
c. Routes and times of departure should be changed periodically so that inmates cannot detect a pattern.
d. Inmates are not permitted to make telephone calls prior to transportation.

2) In order to reduce the likelihood of escapes or other serious problems during transportation, it is important that proper planning, training, and orientation be conducted prior to the trip.

a. Each trip is handled by a minimum of one (1) Jail Officer.
b. Handguns are carried on the opposite side of the body from inmates at all times.
c. Consumption of alcoholic beverages by Jail Officers or inmates is strictly prohibited.
d. Prior to all transportation, the Movement Officer is made aware of the custody classification of inmates involved and other pertinent data, including past escapes.
e. To the greatest extent possible, transportation is conducted during daylight hours.
f. Prior to departure, all inmates are given, at a minimum, a pat "frisk" search (see Policy 3.1.19, Inmate, Employee, and Visitor Searches.)
g. Inmates being permanently reassigned to another institution or facility are transported with all personal property, unless otherwise specified. Prior to transport, such property must be inventoried and thoroughly searched.
h. Inmates are not permitted to possess or spend any funds while in transit.

of tests, x-ray, or any other hospital protocol. Restraints are to be reapplied immediately following any procedure. The inmate is not permitted telephone calls or visitors.

   3) The Superintendent must approve requests from the attending physician for permanent removal of restraints. In the event the inmate in question has a violent history or background or has been combative, at a minimum, the inmate is to be shackled at the wrist or ankle to the bedrail using leather restraints.

**D.  Use of restraints on a pregnant female.**
1) While being transported pregnant females will only be restrained from the front using metal restraints only.
2) If admitted to a hospital the inmate will be restrained to the hospital bed using leather restraints to the left or right arm for safety and security.
3) Prior to giving birth, restraints will be removed.
4) After birth and all medical procedures are completed the leather restraints will again be applied to the left or right arm.
5) Prior to release from the hospital full leather restraints will be applied.

**E.  Assignment to Private Rooms**
1) Any inmate assigned to a room in a non-secure hospital is under the direct supervision of an armed certified Jail Officer. Inmates are not allowed telephone calls or visitors (unless approved by the Watch Commander or his/her designee). The telephone is to be used by the Officer strictly to communicate with supervisors.
2) Jail Officers are prohibited from bringing personal laptops, cell phones or pagers into the hospital room while they are assigned a security detail for a hospitalized inmate. Staff is authorized to bring with them the following items: books, training manuals or magazines to read.
3) Leather restraints are to be applied, at a minimum, to the wrist and ankle and to the bed rail. Restraints are not to be removed unless requested by medical staff for the purpose of any medical procedure or to permit the inmate to use the restroom. Under both circumstances, the inmate is to be closely supervised by the Jail Officer and restraints applied immediately thereafter.
4) Inmates are to be directly supervised at all times during hospital stays. Certified Jail Officers are not to be relieved by hospital security officers; only other certified Jail Officers can relieve them. Relief must be provided at least every
5) Six (6) hours for each officer assigned to hospital duty. There will be no exceptions to this directive. Relief is to be defined as relief of duty by a certified Jail Officer for at least twenty minutes, or for the duration of the 12-hour shift, which would be six (6) hours.
6) The Watch Commander is to notify hospital personnel not to release any information indicating that an inmate is a patient at the hospital.
7) Any family member inquiring about a hospitalized inmate is to be referred to the jail's Medical Department.

**F.  Restraint Equipment**
Inmates are restrained in the following manner:
1) Minimum custody inmates are restrained, at a minimum, in handcuffs, waist chain, and leg irons unless otherwise specified by the Director of Security & Confinement. These inmates are also maintained under direct supervision at all times.
2) Medium and maximum custody inmates are restrained, at a minimum, in handcuffs, waist chains, and leg irons. Additional restraints may be applied if needed.
3) Physical restraints are not removed from any inmate while outside the confines of the Rappahannock Regional Jail unless there is an armed certified Jail Officer present.
4) Inmates are not secured to the vehicle except by use of a seat belt.
5) Restraining equipment must never be used as punishment or in a way that causes undue physical pain or restricts the blood circulation or breathing of an inmate.

**G.  Movement Vehicles**

Movement vehicles used by the Rappahannock Regional Jail will be equipped with a special security screening between the inmates and driver. Officers occupy front seat(s), with the inmate(s) riding in the rear.

1) All movement vehicles are to be examined frequently for hairpins, coat hangers, soft drink bottles, chewing gum, paper, matches, and other seemingly insignificant items that could be used in shimming, jamming, or picking handcuffs, or used as a weapon.
2) All transportation vehicles are to be equipped with a working two-way radio (See Policy No. 1.4.3, Intercom and Radio Use.)
3) Transportation vehicles are never to be operated at speeds in excess of the posted speed limit unless in an emergency situation (See Policy No. 1.3.31, Use of Facility and Personal Vehicles.)
4) Shotguns are carried only under the direction of the Superintendent or Director of Security & Confinement.
5) If a vehicle is mechanically disabled during transport, the driver will attempt to move the vehicle out of traffic lanes and into a safe area. Arrangements must be made to accommodate the inmate(s) and to provide for their security while they are being transported within the community. The Maintenance Department arranges for repairs.

**H. Loading**

When transporting inmates in a Jail vehicle, the seat closest to the security screen is to be left vacant. All inmates sit in the second, third, or fourth seat. The only exceptions are:

1) If more than ten inmates of the same sex are being transported;
2) If both male and female inmates are being transported, males and females must be segregated in the vehicle by an entire bench seat when possible.

**I. Meals on the Road**

1) The inmate eats in the vehicle.
2) Restraining devices are to remain in place.
3) Food not requiring eating utensils and cold (without ice) drinks are appropriate for the inmate.

**J. Emergency Procedures**

Accidents: If a transport vehicle is involved in an accident, the Movement Officer(s) should:

1) Contact State Police on S.I.R.S. or at 1/800/572-2260.
3) Contact Rappahannock Regional Jail on radio or at 1/540/288-5245.
4) Document time of accident, location of accident, persons involved, how accident occurred and the time when State Police, rescue squad, and facility were notified.
5) Notify local rescue squad if anyone is injured due to accident and insure medical attention is rendered to those in need.
6) In the event two or more inmates must be transported to the hospital, the transporting Officer remains with the uninjured inmate(s). Assistance from state and local authorities is requested to insure the safe and secure transportation of those inmates injured to the hospital. The Rappahannock Regional Jail should also be notified so that an Officer(s) can be dispatched to the scene of the accident and/or hospital.
7) If a Movement Officer(s) observes an accident or comes upon an accident, he/she should notify the State Police on S.I.R.S. or at 1/800/572-2260.

**K. Escapes**

In the event that an escape occurs, the Officer in charge of the trip immediately notifies the Rappahannock Regional Jail by radio or telephone of the name of the escapee, sex, race, age, clothing description, personal description (hair color, length, eyes, scars, etc.), direction of travel, whether armed (if so, type of weapon), and time of escape. This Officer is also responsible for documenting all of the above. See Policy No. 3.2.4, Escape Plan.

**V. <u>Cross Reference</u>**

Policy No. 1.3.22, Standards of Conduct



Policy No. 1.3.31, Use of Facility and Personal Vehicles
Policy No. 1.4.2, Telecommunications
Policy No. 1.4.3, Intercom and Radio Use
Policy No. 3.1.10, Use of Restraints
Policy No. 3.1.19, Inmate, Employee, and Visitor Searches
Policy No. 3.1.20, Reporting Institutional Incidents
Policy No. 3.2.4, Escape Plan



# RAPPAHANNOCK REGIONAL JAIL

## DEATH NOTIFICATION/ESCORTED TRIP REQUEST

NAME OF INMATE: ______________________ BLOCK: ____________

NOTIFIED BY: ______________________ DATE: ____________

NAME OF DECEASED: ______________________ DATE OF DEATH: ____________

RELATIONSHIP TO INMATE: ______________________

FUNERAL HOME: ______________________ CONTACT: ____________

ADDRESS: ______________________ TEL: ____________

INFORMATION VERIFIED BY: ______________________

DATE AND TIME OF VIEWING: ______________________

ADDRESS: ______________________

TEL: ____________ DIRECTIONS: ______________________

______________________

---

OFFENSE: ______________________ STATUS: ____________

SENTENCE: ______________________ ESCAPE HISTORY: ____________

DETAINERS/PENDING CHARGES: ______________________

### CLASSIFICATION OFFICER'S RECOMMENDATION

_____ APPROVAL

_____ DISAPPROVAL

______________________
Signature

### DIRECTOR OF SECURITY & CONFINEMENT

_____ APPROVAL

_____ DISAPPROVAL

______________________
Signature

cc: Records Department
Movement Section
Programs Coordinator
Director of Community Corrections & Programs